IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NEVIS JENNINGS, JR., # 151358,    *
                                  *
      Plaintiff,                  *
                                  *
vs.                               * CIVIL ACTION NO. 20-00325-KD-B
                                  *
SEDRICK S. WOODGET, *et al.*,     *
                                  *
      Defendants.                 *

## REPORT AND RECOMMENDATION

Plaintiff Nevis Jennings, Jr., an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint seeking relief under 42 U.S.C. § 1983. (Doc. 1). This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. CivLR 72(a)(2)(R) and is now before the Court on Defendant Sedrick Woodget's motion for summary judgment. (Doc. 24). After careful consideration of Defendant Woodget's motion and supporting materials, and Plaintiff Jennings's verified complaint and response in opposition, the undersigned recommends that Defendant Woodget's motion be **GRANTED,** and that this action be **DISMISSED with prejudice.**

## I. SUMMARY OF FACTUAL ALLEGATIONS

### A.    Complaint's Allegations.

Plaintiff Nevis Jennings, Jr. named as Defendants Correctional Officer Sedrick S. Woodget, Sergeant Jermaine

Bullard, Sergeant Hasheen Bennett[1], and Warden Terry Rabon[2], and sued them in their individual capacity.  (Doc. 1 at 1, 5-6, 11). In an order dated December 4, 2020, the Court dismissed Jennings's claims against Defendants Bullard, Bennett, and Raybon pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief could be granted.  (Doc. 8).

Jennings's claims against the remaining Defendant, Officer Woodget, arise from an incident that he avers occurred at approximately 5:00 a.m. on April 23, 2020, at Holman Correctional Facility ("Holman").  (Doc. 1 at 4-5).[3]  Jennings alleges that, after he and other inmates had eaten breakfast, he suddenly needed to defecate and asked Sergeant Bullard for permission to go to the restroom.  (Id.).  Because an inmate count was being conducted, Sergeant Bullard told him "to hold up until the count was finished."  (Id.).  Once Defendant Woodget finished the count and turned it in to Sergeant Bullard, Jennings headed to restroom area. (Id.).  As Jennings was entering the restroom area, Defendant

---

[1] The disciplinary report reflects that the correct spelling of Bennett's name is Hasheem Bennett.  (Doc. 27-1 at 2).

[2] The disciplinary report reflects that the correct spelling of Rabon's name is Terry Raybon.  (Doc. 27-1 at 16).

[3] Jennings's complaint is sworn under penalty of perjury that his facts are true and correct.  (Doc. 1 at 7).  Such a verified complaint serves as the equivalent of an affidavit for summary judgment purposes.  Sears v. Roberts, 922 F.3d 1199, 1206 (11th Cir. 2019).

Woodget intercepted him and "body slammed [him] hard to the floor" on his surgically repaired hip, skinning both of his legs and causing reinjury and swelling to his hip, which he thought was broken. (Id.). In addition, Jennings defecated on himself. (Id. at 8).

Jennings alleges that when Sergeant Bullard saw Defendant Woodget "body slam" him, Bullard ran toward Jennings as if he would stop Defendant Woodget from subjecting Jennings to further injury. (Id.). Sergeant Bullard said that he had told Jennings he could use the bathroom, but Defendant Woodget then pulled Sergeant Bullard aside and said that "they were on the riot team together." (Id.). Thereafter, Sergeant Bullard acted as if Jennings was in the wrong and had gotten what he deserved. (Id.). Defendant Woodget, Sergeant Bullard, and Sergeant Bennett allowed Jennings to use the bathroom and to shower before he was taken to the infirmary. (Id.).

Jennings was charged with a disciplinary violation, and on May 7, 2020, Warden Raybon approved the recommended disciplinary sanctions. (Id. at 9). Jennings asserts that the disciplinary violated due process, and that the sanctions were permitted to start that same date, whereas the Administrative Regulations require sanctions to start when the inmate receives his copy of the disciplinary report. (Id.). According to Jennings, the disciplinary start date should have been May 13, 2020; however, on

May 8, 2020, the canteen manager informed him that his sanctions had already begun. (Id.). Jennings alleges that Warden Raybon failed to prepare an excessive-use-of-force report for the April 23, 2020 incident and also failed to attach the questions for Jennings's witnesses. (Id. at 9-10). Jennings wrote Warden Raybon about these mistakes and requested that the video of the incident be preserved. (Id. at 10). According to Jennings, Warden Raybon claims he did not receive his letters, and the video which would have shown that any use of force was unnecessary was not preserved. (Id.).

Jennings contends that Defendant Woodget did not provide a reason why he body-slammed Jennings, a 54-year-old prisoner who had just undergone hip surgery the previous year, walks with a visible limp, and had never given Defendant Woodget a reason to hate him. (Id. at 9).

For relief, Jennings seeks $250,000 in compensatory damages and $750,000 in punitive damages from Defendant Woodget. (Id. at 7).

**B.    Defendant Woodget's Answer and Special Report as Supplemented.**

In response to Jennings's allegations, Defendant Woodget filed an affidavit with his special report. (Doc. 14-2). In the affidavit, Defendant Woodget states:

> On April 23, 2020, we were in an Institutional recount. I was attempting to conduct an Institutional recount in

> E Housing Unit. Inmate Jennings, Nevis B/151388 began
> to get off his bed while the Institutional recount was
> still in progress. I gave inmate Jennings several loud
> direct orders to step away and return to his bed. Inmate
> Jennings refused the direct order given and began to
> step towards me. I extended my arm out instructing
> inmate Jennings to stop. Inmate Jennings knocked my arm
> down. I attempted to keep my distance from inmate
> Jennings by extending my arm again. Inmate Jennings
> knocked my arm down again. I immediately placed inmate
> Jennings on the ground. I never used excessive force or
> cruel and unusual punishment at any time during this
> incident.

(Id.).

The Incident Report contains a similar account of the incident. (See Doc. 14-1 at 1). However, it adds that Defendant "Woodget immediately took inmate Jennings to the floor utilizing a two on one take down to gain control of the incident." (Id.). The Incident Report states that Sergeant Bullard heard the commotion and immediately responded, separated Defendant Woodget and Jennings, and instructed Defendant "Woodget to exit the dorm in order to qu[el]l the situation." (Id.). After Jennings had cleaned himself up in the restroom area, Sergeant Bullard escorted Jennings, who walked without assistance, to the Health Care Unit ("HCU") for a medical assessment and took pictures of him for evidence. (Id.). Jennings received a medical assessment of one small abrasion to the elbow and another to the shin. (Id.). At about 5:50 a.m., Jennings was released to his assigned bed pending disciplinary proceedings for disrupting the count and failure to obey a direct order. (Id.).

On June 2, 2020, Jennings sent a letter to the Law Enforcement Services Division alleging that Defendant Woodget used excessive force by throwing him to the floor on April 23, 2020. (Id. at 3). Agent David Martinez interviewed Sergeant Bullard, who stated that Jennings had not asked for permission to use the restroom prior Defendant Woodget placing him on the floor, and that Jennings did not complain of injury until several days after the incident. (Id.).

On June 23, 2020, Agent Martinez interviewed Jennings, who stated that "he held his hand up and motioned to Sergeant Bullard that he needed to use the bathroom [and] Sergeant Bullard motioned for inmate Jennings to go to the bathroom." (Id.). Jennings stated that he did not see Defendant Woodget until he got to the restroom area and told Woodget, "'I have to go shit.'" (Id.). According to Jennings, Defendant Woodget responded, "'[N]o, Mr. Jennings, you have to go back to your bunk.'" (Id.). Jennings stated that Defendant Woodget "pushed him and then put him on the floor." (Id.). Jennings further stated that he had abrasions on his shin and arm, that his right hip was swollen, and that the nurse told him that an x-ray of his hip would be scheduled. (Id. at 4).

On July 23, 2020, Defendant Woodget was interviewed by Agents Tinisha Lamb and Cedric Thomas. (Id.). Defendant Woodget recounted the events, which are also contained in his affidavit.

Defendant Woodget added that Jennings's initial approach toward him was aggressive, and that he had not had any problems with Jennings before or since the encounter. (Id.).

Agent Martinez concluded that Defendant Woodget was justified in his actions, and that the charge of excessive force was unfounded. (Id.). In closing the investigation, Agent Martinez noted that Jennings had forty-two rule violations from 1989 to 2020. (Id.).

Defendant Woodget also submitted with his special report an excerpt from the Male Inmate Handbook regarding conduct reports. (Doc. 14-4 at 1). Number 500 states:

> Regardless of where you are or what you are doing, be certain that you obey any and all orders given to you by an officer or an employee, even though it may differ from a previously given order. Always follow the last order given to you. Do not question the order, and do not try to explain the contradiction in orders.

(Id. at 2) (emphasis added).

The medical records attached to the special report show that Jennings received a body chart in the HCU at 5:25 a.m on April 23, 2020. (Doc. 14-3 at 25). The records reflect that Jennings walked to the HCU and was found to have one-centimeter abrasions on his left elbow and left shin, with "no other [complaints of] injury [and] none [being] noted." (Id.). The superficial abrasions were cleaned, and there were "band aids placed over the sites." (Id. at 26). Jennings was also given a tetanus shot. (Id.). He

reported that his pain was eight out of ten, and that his right side was sore. (Id.). Later that day, at 12:35 p.m., Jennings submitted a sick call slip requesting an x-ray for right hip pain due to Defendant Woodget throwing him to the ground that morning. (Id. at 24). He received an x-ray the same day. (Id.). The radiology report from Dr. Havas states: "Post right hip replacement. There is no acute fracture or periosteal reaction. There is no focal bone lesion. Alignment is anatomic. There is no soft tissue swelling or foreign body identified. Impression: No acute bone abnormality." (Id. at 113). About nine-and-a-half months later, on February 5, 2021, Jennings received another x-ray for right hip pain. (Id. at 111). The x-ray resulted in the same findings by Dr. Havas. (See id.).[4]

The special report was also supplemented with Disciplinary Report HCF-20-00341-1, which reflects that Jennings was charged

---

[4] The Court did not find many records that pre-dated the incident on April 23, 2020, even though Defendant Woodget seemed to allude to such records. See Doc. 14 at 3 n.2 ("Extensive medical records show that Jennings has suffered from hip pain for years before this incident and all the months since this incident."). However, Dr. Fondren's notes of August 22, 2018 state that Jennings had complained of right hip pain for the last three years and would need a total hip replacement to gain pain relief from avascular necrosis of his right hip. (Doc. 14-3 at 124). The records reflect that Jennings had hip surgery. (Id. at 125-26).

Jennings's April 15, 2020 medical record shows that he complained of lower back and left knee pain, which he said was from his surgery. (Id. at 29). He reported using a lot of Icy Hot after sitting for long periods. (Id.). It was observed that he grimaced stepping down from the exam table and had an uneven gait. (Id.).

with and found guilty of failure to obey a direct order of an ADOC employee based on the April 23, 2020 incident. (Doc. 27-1 at 1, 5). The hearing officer recommended that Jennings lose canteen, telephone, and visitation privileges for forty-five days, and that he be placed in disciplinary segregation for forty-five days. (Id. at 5-6). The disciplinary report reflects that on May 7, 2020, Warden Raybon reduced the disciplinary sentence to a thirty-day loss of canteen, telephone, and visitation privileges and no confinement in disciplinary segregation. (Id. at 15-16).

Defendant Woodget's answer denies every material allegation and asserts, among other things, that the complaint fails to state a claim upon which relief can be granted, as well as qualified immunity. (Doc. 13).

**C.    Jennings's Response to the Conversion Order.**

In an order dated November 9, 2021, the Court converted Defendant Woodget's answer and special report into a motion for summary judgment, notified Jennings of his rights and responsibilities under Rule 56 of the Federal Rules of Civil Procedure, and afforded the parties an opportunity to respond. (Doc. 25). The Court advised the parties that they had until January 3, 2022 to submit additional information or evidence in support of or in opposition to the motion for summary judgment, and further advised that the motion would be taken under submission on January 4, 2022. (Id. at 1, 4).

9

In his response, Jennings advised the Court of his desire to proceed with the litigation of this action. (Doc. 29 at 1). He also claimed that he did not receive Defendant Woodget's answer and requested that the Court order Defendant Woodget to serve Jennings with a copy of his answer. (Id.). To that end, Jennings attached an affidavit from Holman Legal Officer Philip Brown stating that Jennings inquired about legal mail he was to have received from the Court prior to November 9, 2021 concerning an affidavit. (Id. at 4). Officer Brown stated that the institutional mail room records did not show inmate Jennings receiving legal mail from this Court in October 2021 or from November 1, 2021 to November 8, 2021. (Id.). The docket reflects that Defendant Woodget's answer and special report were sent to Jennings at his address of record on March 8, 2021. (Doc. 13 at 3; Doc. 14 at 10). The docket further reflects that Jennings requested appointment of counsel after Defendant Woodget's answer and special report were filed. (Doc. 15 at 1).

## II.  **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (per

curiam) ("[S]ummary judgment is appropriate even if '*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'" (citation omitted) (emphasis in original)).

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.
>
> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. 2013) (citations omitted).

As noted *supra*, in considering whether Defendant Woodget is entitled to summary judgment in this action, the Court has viewed the facts in the light most favorable to Plaintiff Jennings. See Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("We view the evidence and all factual

inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

Garczynski, 573 F.3d at 1165 (citations omitted).

Moreover, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. 2011) (per curiam) (same).[5]

Additionally, the undersigned recognizes that "[a]lthough *pro se* pleadings are held to a less strict standard than pleadings filed by lawyers and are thus construed liberally, . . . this liberal construction does not give a court license to serve as *de*

---

[5] Federal Appendix cases are unpublished Eleventh Circuit opinions and are not considered binding precedent, but they may be cited as persuasive authority. See 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."); Henry v. Comm'r of Soc. Sec., 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

*facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." Giles v. Wal-Mart Distrib. Ctr., 359 F. App'x 91, 93 (11th Cir. 2009) (per curiam) (internal quotation marks and citations omitted).

**III. DISCUSSION**

    **A.    Claim for Excessive Force.**

    **1.    Applicable Eighth Amendment Law.**

Jennings brings his action pursuant to 42 U.S.C. § 1983, which requires a plaintiff to "prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law." Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005). For this action, Defendant Woodget, who is an employee of the Alabama Department of Corrections, is a state actor. Thus, to establish a § 1983 claim, Jennings must show that Defendant Woodget violated his constitutional rights.

The constitutional amendment placed at issue by Jennings's allegations of force being used against him is the Eighth Amendment, which prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. Cruel and unusual punishment forbidden by the Eighth Amendment occurs when there is "the unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 318 (1986) (internal quotation marks and citations omitted). What forms the "unnecessary and wanton infliction of pain" varies according to the nature of the alleged constitutional violation. Hudson v.

<u>McMillian</u>, 503 U.S. 1, 5 (1992).

In the context of an excessive force claim, the "core judicial inquiry . . . [is] whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37 (2010) (per curiam) (internal quotation marks and citation omitted). This standard encompasses two elements: a subjective element that requires that an official has "acted with a sufficiently culpable state of mind," and an objective element requiring that the conduct was "objectively harmful enough to establish a constitutional violation." <u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1265 (11th Cir. 2020) (internal quotation marks and citation omitted). The subjective element demands that "the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." <u>Id.</u> (internal quotation marks and citation omitted). The objective element is concerned with "whether the official's actions were 'harmful enough' or 'sufficiently serious' to violate the Constitution[,]" <u>id.</u>, inasmuch as a push or shove that produces no perceptible injury generally fails to state a claim of excessive force. <u>Wilkins</u>, 559 U.S. at 38. That is, the Eighth Amendment excludes from recognition "*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Id.</u> "Injury and force, however, are only imperfectly correlated, and it is the latter

that ultimately counts." Id. "[T]he Eighth Amendment prohibits force that offends 'contemporary standards of decency,' regardless of whether 'significant injury is evident,' though the extent of injury may shed light on the amount of force applied or 'whether the use of force could plausibly have been thought necessary.'" Sconiers, 946 F.3d at 1266 (quoting Wilkins, 559 U.S. at 37).

To ascertain whether force was used maliciously and sadistically, courts consider "(1) the need for force; (2) the relationship between that need and the amount of force used; (3) the extent of the resulting injury; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to that official; and (5) any efforts made to temper the severity of the use of force." Pearson v. Taylor, 665 F. App'x 858, 863 (11th Cir. 2016) (per curiam) (citing Whitley, 475 U.S. at 320–21) ("the Whitley factors"); Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" Hudson, 503 U.S. at 7 (citation omitted). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." Id.

"When evaluating whether the force used was excessive, [courts] give broad deference to prison officials acting to preserve discipline and security." Pearson, 665 F. App'x at 864. The use of force is generally authorized when a prisoner has repeatedly failed to obey an order. Id. Furthermore, "[t]he use of a takedown is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." Miles v. Jackson, 757 F. App'x 828, 830 (11th Cir. 2018) (per curiam) (internal quotation marks and citation omitted) (recognizing that the use of the takedown was not excessive force when the prisoner was tackled onto his bed and then to the cell floor after failing to comply with an order).

### 2.    The Claim.

Turning to Jennings's excessive force claim against Defendant Woodget, Jennings alleges in his complaint that he verbally asked Sergeant Bullard if he could go to the restroom and received a verbal reply that he could go once the count was finished, whereas in his statement to Agent Martinez, who was investigating the incident, Jennings asserted that he "motioned" his request to Sergeant Bullard, and Sergeant Bullard "motioned" his response. (Doc. 1 at 4-5; Doc. 14-1 at 3). Notwithstanding this disparity in Jennings's assertions, the Court recognizes that the evidence of the nonmovant must be believed, and all justifiable inferences must be drawn in his favor. ThyssenKrupp Steel, 926 F. Supp. 2d

16

at 1289-90.

In considering the application of the <u>Whitley</u> factors to this action, the first factor to be discussed is the need for force. In the complaint, Jennings does not mention being ordered by Defendant Woodget to return to his bunk, but in his statement to Agent Martinez, he admitted to being ordered to return to his bunk by Defendant Woodget. (Doc. 14-1 at 3). Jennings's statement to Agent Martinez also aligns with Defendant Woodget's affidavit that he ordered Jennings to step away and return to his bed. (<u>See</u> Doc. 14-1 at 3; Doc. 14-2). In fact, Defendant Woodget stated that he gave several loud direct orders to Jennings to return to his bed (Doc. 14-2), which has not been disputed. Thus, the last order Jennings received was the order from Defendant Woodget to return to his bunk, and according to Rule 500 (Doc. 14-4 at 2), he was required to obey the last order he received without comment, (despite the awkward position in which Jennings was placed of needing to use the bathroom).[6]

Defendant Woodget states in his affidavit that after Jennings

---

[6] The facts that Sergeant Bullard denied giving Jennings permission to use the restroom when Agent Martinez interviewed him (Doc. 14-1 at 3) and in his answers to Jennings's questions attached to the disciplinary report (Doc. 27-1 at 7) are not being considered because the last order Jennings received was from Defendant Woodget to return to his bunk. Thus, the dispute between Jennings and Sergeant Bullard regarding whether Jennings had permission to access the restroom does not factor into the excessive force determination.

refused to obey his direct orders to step away and return to his bed, Jennings stepped toward him, which caused Woodget to "extend[his] arm out instructing" Jennings to stop, but Jennings "knocked [his] arm down." (Doc. 14-2 at 1). Woodget further states that he extended his arm again, and Jennings knocked his arm down again. (Id.). Jennings has not disputed that he failed to follow Defendant Woodget's commands to return to his bed area. When Jennings failed to comply by returning to his bed area, Defendant Woodget needed to use more force to manage the situation with Jennings and restore order. Defendant Woodget "immediately placed . . . Jennings on the ground," (id.), which he described as a "two on one take down to gain control of the incident." (Doc. 14-1 at 1). The need for force was created when Jennings refused or ignored Defendant Woodget's order. See Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990) ("The need for the use of force is established by the undisputed evidence that [plaintiff] created a disturbance.").

Considering the second Whitley factor regarding the relationship between the need for force and the amount of force used, based on the filed materials, the only physical force used that was connected to an injury was the brief takedown of Jennings to the ground. (See Doc. 1 at 4-5; Doc. 14-1 at 1; Doc. 14-2). Jennings has not alleged that any other force was used that caused an injury. Thus, in examining the amount of force used, it appears

to be proportionate with the need for force.  Cf. Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam) (finding that excessive force was not used when an open-handed shove was used to move a drunk and boisterous inmate out of the way, as the force used was proportionate, and it was unforeseen that the inmate would fall and break his hip and wrist and tear his ear).

In looking at the third Whitley factor, the resulting injury, Jennings asserts that Woodget "body slammed [him] hard to the floor on [his] surgically repaired hip," which skinned both of his legs and caused swelling to his hip, which he thought was broken. (Doc. 1 at 4-5, 8).  In the Investigative Report, Jennings added that his arm had an abrasion.  (Doc. 14-1 at 4).  The evidence is undisputed that Jennings was able to walk to the HCU after the brief encounter. (See Doc. 14-1 at 1; Doc. 14-3 at 25).  And, the body chart taken at 5:25 a.m. reflects that Jennings had a superficial abrasion of one centimeter on his left shin and another on his left elbow.  (Doc. 14-3 at 25).  Even though Jennings reported pain as an eight on a ten-point scale and right side soreness, the body chart reflects that he did not complain of any other injury, and he received a tetanus shot and two tablets of acetaminophen 325 mg, which was prescribed for three days, twice a day. (Id. at 25-26).  Later in the day, at 12:35 p.m., Jennings complained of right hip pain from being thrown down on the ground and requested an x-ray.  (Id. at 24).  The x-ray was taken that

19

day and revealed "no acute bone abnormality," which included findings of no soft tissue swelling, no foreign body identified, no fracture, no periosteal reaction, no focal bone lesion, and anatomic alignment.[7]  (Id. at 113).  Then, in a sick call request dated April 26, 2020, Jennings stated that his hip was still hurting, that Meloxicam[8] was okay but could only be used once a day, and that he was out of Icy Hot.  (Id. at 23).  He requested that they check on his left knee brace and on an appointment for an MRI of his left knee.  (Id.).  On April 13, 2020 and April 27, 2020, Jennings complained of left knee pain for which he had been given a sleeve, and on May 5, 2020, he complained of right knee pain for which he was given a sleeve.  (Id. at 55).  Later, in July 2020, Jennings advised that his left knee had been doing better, but he had run out of Meloxicam, causing it to get "bad again."  (Id. at 33).  He also reported back pain.  (Id.).

The body chart supports Jennings's claim that he sustained abrasions as a result of the takedown, but the abrasions are

---

[7] A subsequent x-ray taken for right hip pain on February 5, 2021 revealed the same findings.  (Doc. 14-3 at 111).

[8] Meloxicam's brand name is Mobic or Vivlodex, and it "is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve the symptoms of arthritis (juvenile rheumatoid arthritis, osteoarthritis, and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain.  However, this medicine does not cure arthritis and will only help you as long as you continue to take it." https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited June 9, 2022).

described in the medical record as being small and superficial abrasions, which were cleaned and received "band aids"; apparently, stitches were not needed. (Id. at 25-26). His right side was also noted as being sore. (Id. at 26). The complained-of swelling of the right hip was not noted on either the body chart or on the abrasions-and-lacerations page, and it is not supported by the x-rays taken on the date of the incident or later in February 2021. (See id. at 111, 113). The bottom line is that Jennings's injuries from the takedown are two abrasions and soreness, which are *de minimis* injuries. See Pierre v. Padgett, 808 F. App'x 838, 843 (11th Cir. 2020) (per curiam) (finding that prisoner's injuries of "scrapes, scratches, and minor bruising or swelling" were *de minimis*); Tate v. Rockford, 497 F. App'x 921, 925 (11th Cir. 2012) (per curiam) (finding that excessive force was not used because "a laceration on his forehead, several small abrasions and cuts, and a swollen right eye" were *de minimis* injuries, and "no broken bones or additional injuries" or "permanent injury or debilitating pain" were present); Jones v. City of Dothan, Ala., 121 F.3d 1456, 1460 (11th Cir. 1997) (per curiam) (finding that suspect's injuries from being slammed against a wall, having his legs kicked apart, and being required to raise his arms above his head were *de minimis*, even though he experienced pain in his arthritic knee from having his legs kicked apart and pain from having to lift his arms due to a prior stroke and sought medical attention three days

after the incident); see also Johnson v. Moody, 206 F. App'x 880, 885 (11th Cir. 2006) (per curiam) (finding that superficial injury to inmate's finger and nail that was treated with bandages, non-prescription pain medication, and a tetanus shot was a minor injury which "suggests that the force applied was de mimin[i]s").

The fourth Whitley factor examines the extent of the threat to the safety of staff and inmates. In his verified complaint, Jennings alleged that the count was finished so he headed to the restroom. (Doc. 1 at 4). Defendant Woodget stated in his affidavit that he was attempting to conduct a recount when Jennings left his bed. (Doc. 14-2 at 1); (see also Doc. 14-1 at 1 (statement in the Incident Report that "Officer Woodget was conducting a count of Housing Unit E"). While Jennings may take issue with whether a recount was necessary, there is no evidence before the Court that disputes Defendant Woodget's assertion that he was in the midst of a recount immediately prior to the encounter with Jennings. Nor is there anything suggesting any malice behind Defendant Woodget's order directing Jennings to return to his bed. Jennings's refusal to adhere to Defendant Woodget's direct order caused disorder, and through his action, Defendant Woodget sought to restore proper order. As noted supra, Jennings was charged with a disciplinary violation for disobeying Defendant Woodget's order and was disciplined as a result. The issuance of an order is an area where courts give deference to prison officials, as it

22

is a matter of their professional judgment.  See Bennett, 898 F.2d at 1533 ("Decisions made at the scene of a disturbance to restore order are entitled to a degree of deference."); see also Beard v. Banks, 548 U.S. 521, 530 (2006) (noting that even though a court must draw all justifiable inferences in a nonmovant's favor, the court "must distinguish between evidence of disputed facts and disputed matters of professional judgment [and i]n respect to the latter, our inferences must accord deference to the views of prison authorities").  To maintain discipline and order are goals that are not to be taken lightly by prison officials when dealing with a large group of people whose past misconduct has caused them to be incarcerated.  It is through discipline and order that safety for inmates and staff may be achieved, and maintaining order appears to be precisely what Defendant Woodget sought to achieve in his encounter with Jennings.

Turning to the fifth Whitley factor, the severity of the force employed was tempered by Defendant Woodget.  Initially, Defendant Woodget attempted to use less forceful measures to have Jennings return to his bed.  Because they were unsuccessful, he applied brief and minimal force to take Jennings down; therefore, Jennings's resulting injuries were very minor.  No other evidence was offered showing any unnecessary actions by Defendant Woodget during the takedown or thereafter.  In fact, the Incident Report shows that Sergeant Bullard immediately responded to the

23

commotion, separated Jennings and Woodget, and instructed Defendant Woodget to leave the dorm. (Doc. 14-1 at 1). And, officials tempered the severity of the force by escorting Jennings to the HCU, where his two abrasions were treated by medical personnel and he was given acetaminophen.[9] Later that day, Jennings was given an x-ray to determine whether there was an alteration to his hip replacement. See Miles, 757 F. App'x at 830 ("The officers' use of force was tempered because a nurse came to assist [plaintiff] within a minute of the incident . . . [and plaintiff] has failed to show that the officers' use of force caused him serious injury — the only treatment deemed necessary after the incident was a Tylenol prescription.").

The force applied to Jennings lacks the characteristics of being malicious or sadistic, and there is no other evidence showing that force was maliciously or sadistically applied. Rather, the force appears to be proportionate to the need to bring Jennings and the situation he created under control. See id. (a takedown is proportionate use of force to control an inmate who has failed to obey orders); Tate, 497 F. App'x at 925 (the amount of force needed to simply restore order is not excessive). The evidence reflects that Jennings's injuries were minimal, and that the "force

---

[9] One of the brand names for acetaminophen is Tylenol. https://reference.medscape.com/drug/tylenol-acetaminophen-343346 (last visited June 9, 2022).

was applied in a good-faith effort to maintain or restore discipline[.]" <u>See</u> <u>Wilkins</u>, 559 U.S. at 37. Thus, Jennings has failed to establish the subjective element of an excessive force claim.

To establish an excessive force claim against a prison official, Jennings must also establish the objective element, which requires consideration of whether the wrongdoing was "objectively 'harmful enough' to establish a constitutional violation." <u>Hudson</u>, 503 U.S. at 8 (citation omitted). As discussed more extensively above, Jennings suffered two small abrasions and soreness on his right side immediately after the incident. (Doc. 14-3 at 25-26). Later, he reported pain in his right hip, for which he previously had a hip replacement. (<u>Id.</u> at 24). The x-ray taken on the date of the incident found no swelling of the right hip and no other damage to the hip or its placement. (<u>Id.</u> at 113). Another x-ray taken about nine-and-a-half months later yielded the same result. (<u>Id.</u> at 111).

The objective aspects of Jennings's claim do not indicate injuries attributable to this incident that are greater than *de minimis.* In this situation, Jennings's injuries are reflective of the minimal force used Defendant Woodget, *supra*. Consequently, his injuries are not sufficiently harmful to support a violation of the Eighth Amendment. Thus, Jennings has not established the objective element of an Eighth Amendment claim. Accordingly,

Defendant Woodget is due to be granted summary judgment on Jennings's excessive force claim.

**B.   Disciplinary Claim.**

Jennings also complains about his disciplinary conviction for failure to obey a direct order that he received in conjunction with this incident.   (Doc. 1 at 9-10).   Defendant Woodget is connected to the disciplinary because he is the charging officer and testified at the disciplinary hearing that he gave several direct orders to Jennings to return to his bed, but Jennings failed to comply.   (See Doc. 27-1 at 1, 15).   Jennings was found guilty of the violation, and the sentence he received, after Warden Raybon made alterations to the recommended sanctions, was a thirty-day loss of telephone, visitation, and canteen privileges.   (Id. at 16).

In the situation at hand, Jennings does have not have a constitutionally protected right not to be "falsely or wrongly accused" of a disciplinary infraction.   See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986); Watson v. Turner, 2020 U.S. Dist. LEXIS 144495, at *16, 2020 WL 4643478, at *7 (N.D. Ala. July 16, 2020); Pierce v. Carson, 2014 WL 5643336, at *9 (N.D. Ala. Nov. 4, 2014).   Rather, the right a prisoner possesses is the right not to be denied a liberty interest without due process.   Freeman, 808 F.2d at 951; Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999); see also U.S. Const. amend. XIV (protecting against deprivations

of "life, liberty, or property, without due process of law"). "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies . . . ." Wilkinson v. Austin, 545 U.S. 209, 221 (2005).

In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court examined the sources of liberty interests associated with disciplinary proceedings. The Court held that the Due Process Clause of the Constitution did not give rise to a liberty interest entitling an inmate to the procedural protections set forth in Wolff v. McDonnell, 418 U.S. 539 (1974). Sandin, 515 U.S. at 487. The Court recognized, however, that States may create liberty interests protected by the Due Process Clause. Id. at 483-84. It stated that "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. When an inmate suffers a grievous loss of a substantive interest, the Due Process Clause's protection is invoked. Id. at 485-86.

In Sandin, the Court found that an inmate's disciplinary sentence of thirty days in disciplinary segregation was not a dramatic departure from his sentence and was not an "atypical,

significant deprivation in which a State might conceivably create
a liberty interest." Id. at 475, 486. That is, the Court found
that the disciplinary sentence did not work a major disruption in
the inmate's environment because the conditions in disciplinary
segregation mostly mirrored the conditions in administrative
segregation and protective custody. Id. at 486. Thus, the Court
ruled that the inmate did not have a protected liberty interest
entitling him to due process protections, as the range of his
disciplinary segregation confinement was within the range normally
expected for a prisoner serving a criminal sentence of thirty years
to life. Id. at 487; see Smith v. Deemer, 641 F. App'x 865, 868
(11th Cir. 2016) (per curiam) (to find a liberty interest, the
atypical and significant hardship must exist for a significant
length of time); cf. Al-Amin v. Donald, 165 F. App'x 733, 739 (11th
Cir. 2006) (per curiam) (finding that thirty months' confinement
to administrative segregation did not constitute an atypical and
significant hardship that would give rise to a liberty interest);
Lekas v. Briley, 405 F.3d 602, 612 (7th Cir. 2005) (finding that
ninety-day confinement to disciplinary segregation was not an
atypical and significant hardship); Flynn v. Scott, 2006 U.S. Dist.
LEXIS 28280, at *9, 2006 WL 1236718, at *3 (M.D. Ala. May 8, 2006)
(finding that plaintiff's temporary loss of privileges, assignment
to disciplinary segregation for forty-five days, and referral for
a reclassification hearing did not represent a dramatic departure

from ordinary conditions of confinement entitling him to due process protection).

Here, Jennings's disciplinary sentence of a thirty-day loss of canteen, visitation, and telephone privileges is not a dramatic departure from the ordinary conditions of incarceration. An inmate's ability to visit, to shop, and to use the telephone is heavily restricted while in prison, as are most aspects of an inmate's life. See Sandin, 515 U.S. at 485. The further restriction of these privileges for a short period of time, moreover, is a less severe punishment than confinement to disciplinary segregation. Such restriction is not "atypical," nor is it a "significant hardship" under the Sandin analysis, and it is a type of discipline that should be expected by a prisoner as an incident to his criminal sentence. See id. Thus, Jennings does not have a liberty interest in telephone, canteen, and visitation privileges to which due process attaches. Therefore, his disciplinary hearing was not required to comport with due process principles. Accordingly, no violation of Jennings's constitutional rights occurred with respect to his disciplinary conviction, and Defendant Woodget is due to be granted summary judgment on Jennings's disciplinary claim.

**IV.  CONCLUSION**

For the foregoing reasons, it is recommended that Defendant Woodget's motion for summary judgment be **GRANTED**. It is further

recommended that judgment be entered in favor of Defendants Correctional Officer Sedrick Woodget, Sergeant Jermaine Bullard, Sergeant Hasheem Bennett, and Warden Terry Raybon, that Plaintiff Nevis Jennings, Jr. take nothing from Defendants, and that this action be **DISMISSED with prejudice** in its entirety.

<u>**NOTICE OF RIGHT TO FILE OBJECTIONS**</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation

where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **10th** day of **June, 2022.**

/s/ SONJA F. BIVINS
UNITED STATES MAGISTRATE JUDGE